UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

LISA HOLMES,

                Defendant.

**DECISION AND ORDER**
19-CR-249S (2)

## I.     INTRODUCTION

Presently before this Court is the government's request for an upward variance or upward adjustment to Defendant Lisa Holmes's sentencing guidelines calculation due to the overdose death of N.R. on December 24, 2018.   Because this Court finds that the government has failed to prove by a preponderance of the evidence that Holmes is responsible for N.R.'s death, the government's requests are denied.

## II.     BACKGROUND

On December 18, 2019, a federal grand jury returned a 10-count indictment against Holmes and her co-defendant, Luis Rodriguez.   (Indictment, Docket No. 8.) Holmes was charged in Counts 1-7.   Count 1 charged conspiracy to possess with intent to distribute, and to distribute, heroin, fentanyl, cocaine, and butyryl fentanyl, between April and September 2019, in violation of 21 U.S.C. § 846.   Counts 2-7 charged distribution of controlled substances on six separate occasions between April 2 and May 30, 2019, in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(C).[1]

On August 19, 2020, Holmes appeared before this Court and pleaded guilty to the

---

[1] Counts 2, 3, and 5 additionally charged aiding and abetting under 18 U.S.C. § 2.

Count 1 conspiracy charge pursuant to a plea agreement.   (Docket Nos. 55, 56.)   That agreement first sets out Holmes's maximum statutory penalties: a 30-year term of imprisonment; a $2 million fine; a mandatory $100 special assessment; and a term of supervised release of at least 6 years and up to Life.   (Plea Agreement, Docket No. 55, ¶ 1.)   It then sets out the contemplated sentencing guidelines penalties based on a total offense level of 21 and a criminal history category of II: a term of imprisonment between 41 and 51 months; a fine between $15,000 and $2 million; and a 6-year term of supervised release.   (Id. ¶ 10.)

The plea agreement further contains a reservation of rights provision.   (Id. ¶ 11.) The government reserved its right to argue for an upward adjustment under U.S.S.G. §§ 5K2.1 (Death (Policy Statement)) and 5K2.2 (Physical Injury (Policy Statement)), and for a non-Guidelines sentence (variance) above the applicable sentencing guidelines range, based on N.R.'s death on December 24, 2018.   (Id.)   In turn, Holmes reserved her right to oppose the government's requests.   (Id.)   Upon entry of Holmes's guilty plea, this Court scheduled an evidentiary hearing concerning the circumstances of N.R.'s death. (Docket No. 56.)

After several pandemic-related adjournments, this Court conducted the evidentiary hearing on September 9, 2021, with post-hearing submissions completed as of November 12, 2021.   (Docket Nos. 64, 71, 72, 76, 102, 107, 108, 110, 111.)   The government offered four witnesses: D.R. (N.R.'s mother); Michael Stempki (DEA Task Force Officer); John Orlando (FBI Supervisory Special Agent); and Alexandra Hart, M.D. (Associate

Chief Medical Examiner).[2]   Holmes did not call any witnesses.   This Court admitted government exhibits 1-7 and defense exhibits A-C into evidence by the parties' stipulation.   (Docket No. 108; Hearing Transcript ("Tr."), Docket No. 116, at 8-9, 32.)

## III.   HEARING TESTIMONY AND EVIDENCE

### A.   D.R.'s Testimony

N.R. passed away on December 24, 2018, at the age of 34.   (Tr. at 14, 16, 23.) At the time, he was living with his mother, D.R., in her tri-level house in Hamburg, N.Y. (Tr. at 12-15, 34.)

On the morning of N.R.'s death, D.R. left for work at 6:00 a.m., while N.R. presumably slept in his bedroom.   (Tr. at 17, 19, 58.)   D.R. finished work at 11:30 a.m., ran an errand, and returned home around 1:45 p.m.[3]   (Tr. at 17-19, 59-60.)

Once home, D.R. went upstairs to use the bathroom and saw N.R. sitting on his bedroom floor hunched over next to his dresser.   (Tr. at 18-19, 59.)   Thinking that N.R. had passed out, D.R. tried to rouse him by calling to him from the bathroom.   (Tr. at 18.) When N.R. did not respond, D.R. entered his room, shook his shoulders, and watched him fall backwards.   (Id.)   She immediately knew something was wrong and called 911. (Id.)

D.R. had seen N.R. sporadically in the three days before his death.   On December 21, 2018, D.R. saw N.R. briefly when she returned from work and spoke to him several

---

2 This Court finds all witnesses credible.

3 D.R. testified on direct examination that she returned home around 12:45 p.m., but when confronted on cross-examination with the police report indicating that law enforcement responded to the scene around 1:45 p.m., D.R. admitted that her timeline could have been off by one hour.   (Tr. at 17-19, 59-60.)

times over the phone while she was driving to an evening memorial service in Holland, N.Y.   (Tr. at 22-23, 28-29, 51-53.)   When D.R. returned home from the service late in the evening, she did not get N.R. out of his room because she knew that he was upset over his pet lizard's death earlier that day.   (Tr. at 22-25, 52, 54.)

The next day, D.R. left the house for a few hours to bake cookies with her daughter. (Tr. at 25-26, 28, 54.)   She did not see or hear N.R. at all that day, and while she did not know for sure, she believed that he was in his bedroom when she left and returned.   (Tr. at 25-26, 28, 54-55.)   D.R. testified that she did not know whether N.R. left the house that day, but knew that he did not leave while she was home.   (Tr. at 29.)

On December 23, 2018, D.R. and N.R. were home together the entire day.   Id. D.R. first saw N.R. around 9:00 a.m., when he came out of his room for something to drink and complained that his leg hurt.   (Tr. at 26-27, 55-56.)   D.R. thought N.R. "seemed like he was hungover."   (Tr. at 26, 56.)   Later that day, D.R. saw N.R. leave his room to use the bathroom, but N.R. never joined the afternoon football party that D.R. was hosting, and D.R. did not see or speak to N.R. before going to bed around 8:00 p.m. (Tr. at 27-28, 56-58.)

The next time D.R. saw N.R. was when she found him unresponsive on December 24, 2018, and called 911.   (Tr. at 28.)   The Town of Hamburg Police Department responded within minutes.   (Tr. at 19.)   When the first officer arrived, D.R. left N.R.'s room while the officer began assessing the situation and assisting N.R.   (Tr. at 20.) Other law enforcement and medical personnel soon arrived on the scene, and D.R. permitted law enforcement to take N.R.'s yellow cell phone, which D.R. understands to

be the only cell phone N.R. used.   (Tr. at 20, 36.)   D.R. testified that she did not know whether N.R. left the house during the time that she was gone that day, but she believed he was in his room when she left for work.   (Tr. at 29-30, 61.)   At some point, D.R. was notified that N.R. died of an overdose.   (Tr. at 21.)

D.R. was aware that N.R. had used drugs in the past, but she did not believe that he used them while he lived with her.   (Id.)   D.R. knew that N.R. smoked marijuana, that he used mushrooms "every now and then," and that he had previously tried Lortabs and heroin.   (Id.)   On cross-examination, however, D.R. acknowledged that in 2014 she told law enforcement that N.R. had a heroin problem.   (Tr. at 38.)   She also confirmed that N.R. was growing marijuana in his closet.   (Tr. at 51.)   D.R. was not aware of N.R. being in any kind of drug-treatment program, except for outpatient treatment in his early twenties for Oxycontin.   (Tr. at 21, 39-40.)

D.R. testified that, at the time of his death, N.R. did not work, did not drive, and did not own a vehicle.   (Tr. at 22, 30, 40-41.)   She stated that N.R. knew how to drive and had a driver's license for identification purposes, but that he had not driven for many years because his license was suspended due to child support arrears.   (Tr. at 22, 35.)   D.R. further testified that she generally drove N.R. when he needed to go somewhere, and sometimes his friend "J.J." or a family member would also pick him up to go fishing and the like.   (Tr. at 22, 30, 42-44.)   To D.R.'s knowledge, N.R. did not use public transportation, taxis, or ride-sharing services.   (Tr. at 44.)

**B.   Michael Stempki's Testimony**

After N.R.'s death, the DEA Task Force became involved in the investigation

5

because one of the Task Force agents happened to be a Town of Hamburg police officer. (Tr. at 67.)   DEA Task Force Officer Michael Stempki testified about the investigation. (Tr. at 63-64, 67.)   He indicated that Town of Hamburg police officers responded to D.R.'s address after dispatch received D.R.'s 911 call.   (Tr. at 69.)   D.R. greeted the first responders, who determined that N.R. was deceased.   (Id.)   At that point, Town of Hamburg police detectives were notified and responded to the scene.   (Id.)   They discovered a plastic baggie containing a white, powdery substance on N.R.'s dresser, needle caps on top of the dresser, and an unused needle on the bed.   (Tr. at 69; Exhibits 4e and 4f.)   They further discovered a used needle underneath N.R.   (Tr. at 69.)

Law enforcement submitted the white, powdery substance found in N.R.'s room for forensic testing.   (Tr. at 70, 72, 73-74.)   The substance contained fentanyl and tramadol, each of which is a controlled substance.   (Tr. at 74, 95; Exhibit 6, p. 4.)   No cocaine or benzodiazepines were present.   (Tr. at 95.)

Given the nature of the scene, the detectives contacted narcotics investigators from their department, who also responded.   (Tr. at 69.)   Narcotics investigators recovered N.R.'s cell phone, which was in his aunt's name, and obtained permission from N.R.'s aunt to search it.   (Tr. at 69-70.)   The search revealed Facebook Messenger communications between N.R. and Holmes on December 21, 2018, concerning their narcotics activities.   (Tr. at 70, 74-75; Exhibit 7.)

N.R. and Holmes knew each other from middle school and had used drugs together a few times before December 2018.   (Tr. at 92, 99; Exhibit 3.[4])   The Facebook

---

4  Exhibit 3 is a video recording of Holmes's interview with law enforcement.   The discussion pertaining to Holmes's interactions with N.R. begins at the 46-minute mark of the video file (21:19:19 of the raw CAM2

Messenger exchanges began at 11:47 a.m., with Holmes asking N.R. whether he or anyone he knew would purchase suboxone from her because she needed money. (Tr. at 75-76; Exhibit 7, p. 1.)   At 2:11 p.m., N.R. responded that he may know a purchaser and inquired whether Holmes had suboxone pills or strips. (Tr. at 75-76; Exhibit 7, p. 1.) At 3:19 p.m., Holmes responded that she had suboxone strips. (Tr. at 76; Exhibit 7, p. 1.)

At 3:33 p.m., N.R. responded to Holmes and asked whether she was trying to get high, to which Holmes responded, "I already am, but I have a lot of things I need to take care of and I'm trying to get some methadone if you know anybody I can get it from." (Tr. at 76-77; Exhibit 7, p. 1.)   The discussion then turned to Holmes' heroin use at 3:57 p.m., and she explained to N.R. that she had been using heroin with fentanyl in it. (Tr. at 77-79; Exhibit 7, p. 2.)   N.R. responded, "Damn," and told Holmes that a person he contacted to get methadone for her could not get it. (Tr. at 78-79, 103; Exhibit 7, p. 2.) Holmes thanked N.R. and the conversation ended. (Tr. at 79, 103-104; Exhibit 7, p. 2.)

The conversation resumed again nearly two hours later, when, at 5:46 p.m., N.R. messaged Holmes and inquired, "how much is the d?" (Tr. at 79; Exhibit 7, p. 2.)   Officer Stempki testified that "d" refers to "dope," which is slang for heroin. (Tr. at 77, 79.) Holmes responded, "60 half 110 whole," which Officer Stempki testified likely referred to $60 for half of a gram and $110 for a whole gram. (Tr. at 79; Exhibit 7, p. 2.)   Officer Stempki further estimated that typical personal use of heroin would be one gram per day or one gram every two days. (Tr. at 79.)

---

recording).

7

After receiving the price, N.R. and Holmes engaged in the following exchange:

| | |
|---|---|
| N.R.: | it's fet tho? |
| Holmes: | Yes strait fire like insane |
| N.R.: | Like if I do a bag it will kill me? |
| Holmes: | There is no bags.   It's half g or whole.   And no but I would take it easy until u figure out what u can handle. |

. . .

| | |
|---|---|
| N.R.: | . . . I'm just thinking if I wanna get some |
| Holmes: | U will love it.   I love to smoke it. |

(Exhibit 7, p. 2.)

Officer Stempki testified that "fet" refers to fentanyl.   (Tr. at 80; Exhibit 7, p. 2.) He further expressed his belief that Holmes was warning N.R. that the dope she had been using was extremely potent ("strait fire") and that N.R. should be careful because he could react negatively to it at first ("take it easy until u figure it out").   (Tr. at 80-81, 105.)

After discussing the heroin, Holmes told N.R. that her source was located somewhat near her location, and N.R. told Holmes that she would need to pick him up and drive him to make the buy.   (Tr. at 82; Exhibit 7, p. 2.)   Holmes asked N.R., "U gonna be able to give me a little something? And 5 for gas[?]," to which N.R. responded, "I can I'm just thinking if I wanna get some."   (Exhibit 7, p. 2.)   Holmes responded that she would try to get someone to drive them, and that N.R. did not know either the potential driver or the source of the heroin.   (Tr. at 82; Exhibit 7, p. 2.)   Holmes then tried to call N.R. at 6:20 p.m., and N.R. returned the call at 6:29 p.m., at which time they spoke for approximately 11 minutes.   (Tr. at 82; Exhibit 7, p. 2.)   The messaging exchange

8

concluded with Holmes telling N.R. that she was on her way to pick him up.   (Tr. at 82-83; Exhibit 7, p. 3.)

During her interview with law enforcement, including Officer Stempki, Holmes advised that she went with N.R. to the Riverside area of the City of Buffalo to purchase heroin from one of her multiple sources of supply.   (Tr. at 91-92, 97; Exhibit 3.)   On cross-examination, Officer Stempki testified that low-level drug users often have multiple sources of supply.   (Tr. at 96.)   Holmes further stated that she and N.R. each purchased heroin separately from an individual called "G" or "D," and then went back to her house to use the drugs.   (Tr. at 92, 100-101; Exhibit 3.)

Holmes stated in her interview that N.R. "seemed more normal and seemed fine" while using the drugs compared to herself, and that N.R. was actually more concerned about her condition than his own.   (Tr. at 100; Exhibit 3.)   She also indicated that N.R. used almost all of the drugs that he purchased that night and had barely any left.   (Tr. at 101.)   After they used together, Holmes took N.R. back to his house and recalled that "he was in really good shape."   (Tr. at 101; Exhibit 3.)

At 4:14 a.m. on December 22, 2018, apparently after Holmes took N.R. home, the two exchanged the following text messages:

> Holmes:      Im home safe n sound xo
>
> N.R.:        Ok awesome babe I had so much fun with you
>              guys and Angel talk to you soon

(Tr. at 110-111; Exhibit B.)

Later that morning, at 11:43 a.m.:

> Holmes:      Ditto babes we had fun with u too!   We will get

up again soon

N.R.:        That would be awesome You guys rock

(Tr. at 111-112; Exhibit B.)

Upon discovering the Facebook Messenger exchanges between N.R. and Holmes, law enforcement began to investigate Holmes's drug-trafficking activities by arranging a series of six controlled buys of heroin through a confidential source, beginning on April 2, 2019.   (Tr. at 84-88, 112.)   Law enforcement tested the heroin purchased from Holmes during these buys and determined that the first four substances contained heroin, cocaine, quinine, [5] and caffeine.   (Tr. at 89-90; Exhibit 1a-1-d.)   The fifth substance contained fentanyl, cocaine, quinine, caffeine, butyryl fentanyl, and xylazine. (Tr. at 90; Exhibit 1e.)   The final substance contained butyryl fentanyl, heroin, fentanyl, quinine, xylazine, and tramadol.   (Tr. at 90; Exhibit 1f.)   These six controlled buys formed the basis of Counts 2-7 in this case.   (Tr. at 90.)

## C.    John Orlando's Testimony

John Orlando is a Special Agent with the FBI and an expert in cell phone and cell phone records analysis.   (Tr. at 116-17.)   He is a member of the FBI Pittsburgh division's Cellular Analysis Survey Team and was contacted by the FBI Buffalo division to analyze the cell phones and cell phone records in this case.   (Tr. at 117, 128.)   A PowerPoint presentation summarizing Agent Orlando's analysis is contained in Exhibit 2.   (Tr. at 128-29; Exhibit 2.)

Cell phone records reflect that on December 21, 2018, N.R. received an incoming

---

5 Officer Stempki testified that quinine is a malaria drug that was likely added to the substance to make it heavier, thereby resulting in greater profit to the dealer.   (Tr. at 89.)

call from Holmes at 6:41 p.m.   (Tr. at 133-34, 141; Exhibit 2, pp. 10-11.)   It appears that

both N.R. and Holmes were at their respective residences when this call occurred.   (Tr.

at 133-34, 141-42; Exhibit 2, pp. 10-11.)   At approximately 7:46 p.m., Holmes was on or

near Interstate 190 when she called N.R., who was still at his residence.   (Tr. at 134-35;

Exhibit 2, pp. 12-13.)   At 7:50 p.m., Holmes's phone registered at cell towers near N.R.'s

residence, indicating that she was traveling toward his house.   (Tr. at 135, 140, 142;

Exhibit 2, p. 13.)   Cell records further indicate that Holmes's phone was active back near

her own residence later that evening.   (Tr. at 135, 143-44; Exhibit 2, pp. 14, 15.)

The next activity between N.R.'s and Holmes's phones occurred at 12:25 a.m. on

December 22, 2018, when N.R. called Holmes.   (Tr. at 135-36, 144; Exhibit 2, p. 16.)

Both phones were in the vicinity of Holmes's residence.   (Tr. at 144; Exhibit 2, p. 16.)

## D.   Alexandra Hart's Testimony

Alexandra Hart, M.D., is the Associate Chief Medical Examiner at the Erie

County Medical Examiner's Office.   (Tr. at 147-48.)   She performed an autopsy on N.R.

on December 26, 2018, and prepared an autopsy report.   (Tr. at 153; Exhibit 5.)   Dr.

Hart's external examination revealed three needle-puncture marks on N.R.'s right arm

that Dr. Hart determined to be consistent with intravenous drug use.   (Tr. at 155-57, 160;

Exhibit 5, p. 2.)   The internal examination was remarkable for congested lungs, but

otherwise all organs were normal.   (Tr. at 157-58, 170; Exhibit 5, p. 3.)

As part of the autopsy, Dr. Hart extracted bodily fluids from N.R. and sent them for

a comprehensive toxicology screening.   (Tr. at 154.)   The toxicology report revealed the

presence of fentanyl and cocaine most prominently.   (Tr. at 158-59; Exhibit 5, pp. 6-7.)

11

It also revealed metabolites of both substances.  (Tr. at 159; Exhibit 5, pp. 6-7.)  The amount of fentanyl found in N.R.'s body was consistent with amounts typically found in overdose and intoxication deaths.  (Tr. at 159, 172.)  Dr. Hart also determined, based on the presence of the cocaine and fentanyl themselves (and not just their metabolites), that N.R. had used the drugs recently.  (Tr. at 174.)  As a result of the totality of her examination, Dr. Hart determined the cause of N.R.'s death to be "acute intoxication due to the combined effects of fentanyl, cocaine, tramadol, and benzodiazepines."  (Tr. at 159, 160-70.)

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW[6]

**A.    Governing Law**

The government maintains that an upward variance or upward adjustment under U.S.S.G. §§ 5K2.1 (Death (Policy Statement)) and 5K2.2 (Physical Injury (Policy Statement)) is warranted because Holmes sold N.R. the dose of fentanyl that killed him. Because N.R.'s death predates the charged criminal conduct, the government proceeds under the theory that Holmes's involvement is relevant conduct attributable to her under U.S.S.G. § 1B1.3 (a)(2).   (Tr. at pp. 6-7, 177.)

For offenses that would require the grouping of multiple counts under the sentencing guidelines, such as the drug offenses charged here, relevant conduct consists of all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.  See U.S.S.G. § 1B1.3 (a)(2); United States v.

---

6 This Court's sentencing findings are made by a preponderance of the evidence.   See United States v. Ryan, 806 F.3d 691, 694 (2d Cir. 2015); United States v. Cordoboa-Murgas, 233 F.3d 704, 710 (2d Cir. 2000).

Silkowski, 32 F.3d 682, 687 (2d Cir. 1994).   Such conduct may be considered in determining whether an adjustment under U.S.S.G. §§ 5K2.1 or 5K2.2 is warranted.   See United States v. Kim, 896 F.2d 678, 684 (2d Cir. 1990); United States v. Purchess, 107 F.3d 1261, 1270-72 (7th Cir. 1997).

U.S.S.G. §§ 5K2.1 and 5K2.2 allow a court to increase a sentence above the authorized guideline range when death or significant physical injury result from the criminal or relevant conduct.   A three-step analysis applies.

First, as a threshold matter, a court must find by a preponderance of the evidence that the defendant's conduct resulted in death or significant physical injury.   See United States v. McCray, 17-CR-147, 2020 WL 103476, at *2 (W.D.N.Y. Jan. 9, 2020) (quoting United States v. Cordoboa-Murgas, 233 F.3d 704, 710 (2d Cir. 2000)).   In making this determination, a court may rely on circumstantial evidence.   Id.

Second, if a court finds it more likely than not that death or significant physical injury resulted from the defendant's conduct, it must decide whether to apply an upward adjustment.   See Cordoboa-Murgas, 233 F.3d at 710.   It need not necessarily do so. Under § 5K2.1, the decision is driven by a consideration of the defendant's state of mind, the degree of planning or preparation, the number of deaths, and the means by which life was taken.   Similar considerations guide the decision under U.S.S.G. § 5K2.2.

Third, if a court finds it more likely than not that death or significant physical injury resulted from the defendant's conduct and that an upward adjustment is warranted, it must determine the extent of the adjustment.   Under § 5K2.1, a court must consider the dangerousness of the defendant's conduct, the extent to which death or serious injury

13

was intended or knowingly risked, and the extent to which the applicable offense level already factors the risk of death or personal injury.   Under § 5K2.2, a court must consider the extent of the injury, whether the injury may be permanent, and the extent to which the injury was intended or knowingly risked.

## B.    Findings of Fact

Having considered the hearing testimony and reviewed the record evidence, this Court finds that the government has failed to prove by a preponderance of the evidence that Holmes's conduct resulted in death or significant injury to N.R.

### 1.   Holmes did not sell fentanyl heroin to N.R. on December 21, 2018.

At the outset, the government has wholly failed to establish the central premise of its position—that it is more likely than not that Holmes sold N.R. the fatal dose of fentanyl. Although the government repeatedly states that Holmes sold N.R. the fatal dose, repetition does not make it so.   See Government's Pre-hearing Memorandum of Law, Docket No. 92, pp. 2 ("the defendant sold the lethal dose of fentanyl to N.R."); 3 ("the evidence in this case will demonstrate that the defendant sold the fentanyl that killed N.R."); Government's Post-hearing Memorandum of Law, Docket No. 110, pp. 2 ("A few days prior to his death, the defendant sold the lethal dose of fentanyl to N.R."); 5 ("After the defendant sold the fentanyl to N.R. . . ."); 17 ("The text messages between N.R. and the defendant show that the defendant intentionally sold fentanyl to N.R. . . ."); 19 ("The defendant knowingly risked death or serious injury to the user of the drugs (N.R.) she sold, and N.R. lost his life as [a] result of using those drugs."); 19 ("the defendant sold the fentanyl that ultimately resulted in N.R.'s death").   Despite these representations, the

government presented no evidence that Holmes sold N.R. fentanyl heroin or any other controlled substance directly or indirectly.

First, there is no evidence whatsoever that Holmes sold fentanyl heroin directly to N.R.   No evidence was presented that N.R. paid Holmes or that Holmes provided any controlled substances to N.R.   Instead, the uncontroverted evidence established that Holmes and N.R. traveled together to Riverside to purchase fentanyl heroin from a third-party called "G" or "D."[7]

Second, there is no evidence that Holmes constructively sold fentanyl heroin indirectly to N.R.   Although N.R. knew "G" or "D" from having previously purchased fentanyl heroin from him, no evidence of any relationship between Holmes and "G" or "D" was presented.   No evidence was presented that Holmes worked for "G" or "D" or benefited in any way from N.R.'s purchase of drugs from "G" or "D."   And although Holmes told N.R. the price and warned him about the potency of the drugs, it is clear from the Facebook messages that her knowledge stemmed from her previous purchase and use of the product, not from any connection to "G" or "D."

Third, the evidence does not establish that Holmes induced or pressured N.R. into purchasing fentanyl heroin.   According to the messages between them, it was N.R., not Holmes, who first raised the idea of purchasing heroin that night.   Nearly two hours after their initial exchange about suboxone, N.R. re-contacted Holmes (not the other way

---

7 It is further worth noting that the make-up of the substances found in N.R.'s system and the make-up of those substances Holmes sold months later during the course of her criminal conduct appear disparate. N.R.'s toxicology report was most prominently positive for the presence of cocaine and fentanyl and their metabolites.  (Tr. at 158-59; Exhibit 5, pp. 6-7.)   The substances Holmes sold months later contained additional substances not found in N.R.'s screening, such as quinine, caffeine, and xylazine.   (Tr. at 89-90; Exhibit 1a-1f).

around) to inquire about the cost of the fentanyl heroin that she had been using.   From there, the two mutually decided to purchase and use drugs together that night.

Consequently, rather than establishing that Holmes sold N.R. fentanyl heroin on December 21, 2018, the evidence shows that Holmes and N.R. were both drug users who traveled together to separately purchase drugs from a third-party.   There is simply no evidence of a buyer-seller relationship between N.R. and Holmes.[8]

### 2. The fentanyl heroin that N.R. purchased with Holmes on December 21, 2018, was not the "fatal dose."

Even if it could be found that Holmes sold or induced N.R. into purchasing fentanyl heroin on December 21, 2018, the government has further failed to establish the second part of its central premise—that it is more likely than not that the fentanyl heroin purchased that night was the "fatal dose."   N.R. purchased and used fentanyl heroin with Holmes on the evening of December 21, 2018.   D.R. found N.R. deceased three days later, on the afternoon of December 24.   For a number of reasons, this Court cannot conclude that the fentanyl heroin N.R. purchased on December 21 is more likely than not the substance that killed him on December 24.

First, the evidence supports a finding that N.R. immediately used nearly all of the fentanyl heroin that he bought on December 21.   Officer Stempki testified that a typical personal-use amount of heroin would be one gram per day or one gram every other day. This is the amount that N.R. and Holmes discussed purchasing—half-gram and one-gram

---

8 The government also relies on two related propositions for which it presented no evidence—that "[Holmes] regularly – indeed, on a daily basis – distributed fentanyl to others, including N.R.," and that "[Holmes] was a known drug dealer."   See Government Post-hearing Memorandum of Law, p. 19.   Since no evidence whatsoever was presented to support either point, these propositions similarly fail for lack of proof.

quantities.   And Holmes advised law enforcement during her interview that she had previously purchased only one-gram quantities from "G" or "D."   Holmes further advised law enforcement that N.R. used nearly all of the drugs he purchased the same night that he purchased them, with barely any left.   This Court therefore finds that N.R. purchased a personal-use quantity of fentanyl heroin that night and immediately used nearly all of it.

Second, the government presented no evidence that N.R.'s use of the fentanyl heroin on December 21 caused his death on December 24.   Holmes told law enforcement that N.R. "seemed more normal and seemed fine" after using the drugs and "was in really good shape" when they parted ways in the early hours of December 22. N.R. was thereafter in coherent contact with Holmes via phone and interacted with D.R. two days later in the morning and afternoon.   And Dr. Hart testified that N.R. must have used the substance that killed him near in time to his death on December 24—indeed a used needle was found beneath him—because cocaine and fentanyl themselves appeared in the toxicology report (and not just their metabolites).   This Court therefore finds insufficient evidence to conclude that N.R.'s death was caused by his use of fentanyl heroin on December 21, 2018.

Third, the government presented no evidence that N.R.'s overdose was caused by the "barely any" portion of the fentanyl heroin that may have remained after N.R. and Holmes used the drugs together on December 21.   As indicated, the evidence supports a finding that N.R. purchased a single-use quantity of fentanyl heroin from "G" or "D" and used nearly all of it with Holmes three days before his death.   Even assuming that N.R. later used whatever small portion remained, no evidence was presented that such an

amount would be sufficient to cause a fatal overdose.

Finally, the record established that N.R. was an active drug user who had both time and means to obtain and use other substances after December 21, 2018. N.R.'s growth of marijuana and possession of white powder,[9] new and used needles, Narcan nasal spray, and other drug paraphernalia indicate that he was an active drug user. (Exhibits 4d, 4e; Exhibits A 1-8.) And N.R.'s interactions with Holmes on December 21 demonstrate that N.R. had the wherewithal and inclination to seek others' assistance in securing drugs. For example, he contacted unknown individuals to try to secure methadone for Holmes, and Exhibit 7 shows that N.R. was engaged in multiple Facebook Messenger exchanges on December 21 and 22, with a variety of individuals.

As for time, D.R. left the house for part of the day on December 22, went to bed early on December 23, and worked the morning of December 24. She did not see N.R. at all during these time periods. And while D.R. may have genuinely believed that N.R. did not leave the house and was in his room on these occasions, she also thought he was in his room the evening and night of December 21, 2018, when he was actually out purchasing and using drugs with Holmes. There was thus ample time and opportunity for N.R. to obtain and use other drugs from other sources without detection.

For all of these reasons, this Court finds insufficient evidence to conclude it more likely than not that the fentanyl heroin that N.R. purchased with Holmes on December 21, 2018, caused his overdose death.

---

9 The government presented no evidence linking the white, powdery substance found in N.R.'s room to the fentanyl heroin N.R. purchased on December 21, 2018, or to Holmes.

**C.      Conclusions of Law**

   **1.  Holmes's conduct on December 21, 2018, is not "relevant conduct" under
         U.S.S.G. § 1B1.3 (a)(2).**

   Given the findings above, this Court concludes that Holmes's conduct on
December 21, 2018, does not constitute "relevant conduct" under U.S.S.G. § 1B1.3 (a)(2).
Relevant conduct consists of all acts and omissions that were part of the same course of
conduct or common scheme or plan as the offense of conviction.   See U.S.S.G. § 1B1.3
(a)(2); United States v. Silkowski, 32 F.3d 682, 687 (2d Cir. 1994).   To determine whether
acts are part of the same course of conduct, the sentencing guidelines require
consideration of "the degree of similarity of the offenses, the regularity (repetitions) of the
offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 (a)(2), cmt. 5
(B)(ii).   To determine whether acts are part of the same common scheme or plan as the
count of conviction, courts examine whether they are connected by at least one common
factor, such as common victims, common accomplices, common purpose, or similar
modus operandi.   Id. cmt. 5 (B)(i).

   The government makes no effort to explain how Holmes's personal-use *purchase*
of fentanyl heroin with N.R. is relevant conduct as it relates to her conviction for conspiring
to *possess with intent to distribute*, and *to distribute*, controlled substances.   Given that
the government failed to prove that Holmes sold fentanyl heroin to N.R., Holmes' conduct
on December 21, 2018, cannot reasonably be construed as relevant conduct under
U.S.S.G. § 1B1.3 (a)(2).   It is not part of the same course of conduct as her offense of
conviction because it did not involve her sale or distribution of controlled substances, did
not involve repetition of her offense of conviction, and occurred some three months *before*

19

her charged criminal conduct.   No evidence was presented that Holmes was distributing controlled substances or conspiring to distribute controlled substances in December 2018.   Further still, Holmes's conduct is not part of the same common scheme or plan as her offense of conviction because none of the common factors in Comment 5 (B)(i) (recited above) are present.

Accordingly, this Court finds that Holmes's conduct on December 21, 2018, does not constitute "relevant conduct" under U.S.S.G. § 1B1.3 (a)(2).

### 2. Neither an upward variance nor upward adjustment under U.S.S.G. §§ 5K2.1 or 5K2.2 is warranted.

Even if Holmes's conduct on December 21, 2018, qualified as relevant conduct, the government has presented no authority supporting its position that an upward adjustment of any sort is warranted on these facts.

To apply U.S.S.G. §§ 5K2.1 or 5K2.2, a court must find that death or significant physical injury resulted from the defendant's offense of conviction or relevant conduct. But as explained, no such finding can be made on this record.   So too, the government's exclusive reliance on cases involving direct sales between the defendant and decedent provide no basis for an upward adjustment, as this case does not involve a direct sale. See United States v. Hicks-Bailey, 740 F. App'x 751, 752 (2d Cir. 2018) (summary order) (involving direct sale of heroin from the defendant to the decedent); United States v. Sweger, 413 F. App'x 451, 453 (3d Cir. 2011) (same); United States v. Howard, 454 F.3d 700 (7th Cir. 2006) (involving death directly traced to heroin sold by the defendant); United States v. Ihegworo, 959 F.2d 26, 28 (5th Cir. 1992) (involving provision of heroin by the defendant to the decedent via delivery by a third-party); United States v. Russow, No.

3:14CR84 (JBA), 2015 WL 1057513, at *1 (D. Conn. Mar. 10, 2015) (involving direct sale of heroin from the defendant to the decedent).   The government supplies no cases in which an upward variance or adjustment has been applied on facts similar to those presented here.

Accordingly, this Court finds that neither an upward variance nor an upward adjustment under the sentencing guidelines is warranted.

## IV.   CONCLUSION

For the reasons stated above, the government's request to apply an upward variance or upward adjustment to Defendant Lisa Holmes's sentencing guidelines calculation due to the overdose death of N.R. on December 24, 2018, is denied. Sentencing will be scheduled by separate order.

## V.   ORDERS

IT HEREBY IS ORDERED, that the government's request to apply an upward variance or upward adjustment to Defendant Lisa Holmes's sentencing guidelines calculation is DENIED.

FURTHER, that sentencing will be scheduled by separate order.

SO ORDERED.


Dated:   September 15, 2022
   Buffalo, New York

          <u>s/William M. Skretny</u>
          WILLIAM M. SKRETNY
         United States District Judge